## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | |
|---|---|
| DIANA ZUNIGA, Individually, as Heir at Law, and as Representative of the Estate of DANIEL ZUNIGA JR., Deceased. §§§§§§ | |
| MARTHA ZUNIGA, As Natural Mother and Wrongful Death Beneficiary of DANIEL ZUNIGA JR., Deceased, §§§§§ | |
| ANCIETO ZUNIGA-FELAN, As Natural Child and Wrongful Death Beneficiary of DANIEL ZUNIGA JR., Deceased, §§§§§ | CASE NO.____1:22-cv-559_____ |
| MARCI WILLIAMS As Natural Child and Wrongful Death Beneficiary of DANIEL ZUNIGA JR., Deceased, §§§§§ | |
| *Plaintiffs.* §§ | |
| **v.** §§ | |
| COUNTY OF BASTROP, BASTROP COUNTY SHERIFF'S, and SHERIFF MAURICE COOK, *Defendants.* §§§§§ | |

---

## PLAINTIFFS' ORIGINAL COMPLAINT

---

Plaintiffs, DIANA ZUNIGA, MARTHA ZUNIGA, ANCIET ZUNIGA-FELAN and MARCI WILLIAMS, (hereinafter "Plaintiffs"), by and through undersigned counsel, come before this Court to assert the following factual allegations and causes of action against Defendants COUNTY OF BASTROP, BASTROP COUNTY SHERIFF'S OFFICE and SHERIFF MAURICE COOK.

## I.   PARTIES

1.   MARTHA ZUNIGA, ("Plaintiff Martha") is a citizen of the United States of America, resides in Harris County, Texas and is the mother of Daniel Zuniga, Jr. She brings this claim in her individual capacity as a statutory wrongful death beneficiary and as an heir to the Estate of Daniel Zuniga, Jr. pursuant to Texas Civil Practices and Remedies Code §§ 71.002 et. seq. and § 71.021.

2.   DIANA ZUNIGA, ("Plaintiff Diana") is a citizen of the United States of America, resides in Bastrop County, Texas and is the widow of Daniel Zuniga, Jr. She brings this claim in her individual capacity as a statutory wrongful death beneficiary and as an heir to the Estate of Daniel Zuniga, Jr. pursuant to Texas Civil Practices and Remedies Code §§ 71.002 et. seq. and § 71.021.

3.   MARCI WILLIAMS, ("Plaintiff Marci") is a citizen of the United States of America, resides in Bastrop County, Texas and is the natural child of Daniel Zuniga, Jr. She brings this claim in her individual capacity as a statutory wrongful death beneficiary and as an heir to the Estate of Daniel Zuniga, Jr.

pursuant to Texas Civil Practices and Remedies Code §§ 71.002 et. seq. and § 71.021.

4.    ANCIETO ZUNIGA-FELAN, ("Plaintiff Ancieto") is a citizen of the United States of America, resides in Bastrop County, Texas and is the natural child of Daniel Zuniga, Jr. He brings this claim in his individual capacity as a statutory wrongful death beneficiary and as an heir to the Estate of Daniel Zuniga, Jr. pursuant to Texas Civil Practices and Remedies Code §§ 71.002 et. seq. and § 71.021.

5.    Defendant COUNTY OF BASTROP is a legal government entity as defined in TEX. GOV. CODE § 554.001. It is located within the boundaries of the Austin Division of the Western District of Texas. It may be served with citation as follows:

**COUNTY OF BASTROP**
**c/o PAUL PAPE, COUNTY JUDGE**
**804 PECAN STREET**
**BASTROP, TX 78602**

6.    Defendant BASTROP COUNTY SHERRIF'S OFFICE is a legal government entity as defined in TEX. GOV. CODE § 554.001. It is located within the boundaries of the Austin Division of the Western District of Texas. It may be served with citation as follows:

**BASTROP COUNTY SHERIFF'S OFFICE**
**c/o MAURICE COOK, SHERIFF**
**200 JACKSON STREET,**

**BASTROP, TX 78602**

7.    Sheriff Maurice Cook was the Sheriff of Bastrop County during the events

that form the basis of this suit. At all relevant times, he was acting under color

of law. He may be served with citation as follows:

**MAURICE COOK, SHERIFF**
**200 JACKSON STREET,**
**BASTROP, TX 78602**

## II.    MISNOMER/ALTER EGO

8.    In the event any parties are misnamed or are not included herein, Plaintiff

contends that such was a "misidentification," "misnomer," and/or such parties

are/were "alter egos" of parties named herein.

## III.    JURISDICTION AND VENUE

9.    This Court has subject matter jurisdiction over this lawsuit. Plaintiffs' claims

involve the violations of 42 U.S.C. §1983, the Americans with Disabilities

Act, the Eighth Amendment and the Fourteenth Amendment. The amount in

controversy is within this Court's jurisdictional limit.

10.    This Court has personal jurisdiction over the parties. All the parties are either

individuals or government entities of the State of Texas, have sufficient

minimum contacts with the State of Texas, and/or have purposefully availed

themselves of the laws and markets of the State of Texas so as to not offend traditional notions of fair play and substantial justice.

11.    This Court is the proper venue to hear this lawsuit pursuant to 28 U.S.C. §1331, as Plaintiffs are alleging violations to the Decedent's rights under the 8th and 14th Amendments to the U.S. Constitution against Defendant by their failing to give adequate medical attention to and withholding lifesaving and necessary prescribed medications from the Decedent, Daniel Zuniga Jr. Such a violation additionally constitutes a claim under 42 U.S.C. §1983 as it was undertaken while the Decedent was in the care or control of Defendant, agent of the State of Texas. The failure to provide the Decedent with medical care to manage his lifelong disabilities constitutes a violation of the Americans with Disabilities Act. Finally, as these violations to the Decedent's rights were a result of the insufficient training of the medical officers named in this complaint, Plaintiffs invoke the *Monell* Doctrine.

12.    This Court has specific *in personam* jurisdiction over Defendant because this case arises out of conduct by Defendant that injured the Decedent, and which occurred in Bastrop County, Texas, which is within the Western District of Texas.

13.    Venue of this cause is proper in the Western District pursuant to 28 U.S.C. § 1391(b)(1) because a substantial portion of the events or omissions giving rise

to Plaintiffs' claims occurred in Bastrop County, which is within the Western District of Texas.

## IV.   FACTS

### INTRODUCTION & BACKGROUND

### "I CAN"T BREATHE"

14.   "I Can't Breathe" is a gut-wrenching phrase that has surfaced in news reports again and again in recent years, and has become the slogan of a movement for law enforcement reform across America. The events giving rise to this lawsuit revolve around just that – an inmate of Bastrop County Jail suffering from a life-long respiratory disease being denied basic medical treatment to the point he eventually died in-custody at only 38 years old. One of his final communications with the jail read, "Nasal saline please…I can't breathe". This lawsuit seeks to uncover the indifference and lack of care for Mr. Zuniga's medical disabilities that led to him essentially being killed by a long torture of 67-day-long suffocation at the hands of Bastrop County jailers.

15.   The Decedent, Daniel Zuniga Jr., was a survivor of serious lifelong medical disabilities. He had official diagnoses of: Type 2 Diabetes, Gastroesophageal Reflux Disease (GERD), Wegner's Granulomatosis (now known as Granulomatosis with polyangiitis), Pancreatitis and Asthma. In order to fully understand how egregiously Defendant Bastrop County erred in their refusal

to cooperate with Daniel's physician prescribed medical treatments, one must first understand the nature of his disabilities.[1]

16.  Wegener's Granulomatosis (recently re-named as Granulomatosis with polyangiitis) is a very rare, potentially deadly disorder that causes inflammation of the blood vessels in the patient's nose, sinuses, throat, lungs, and kidneys. In general, irritation and inflammation of the nose is the first sign in most patients and persists as the most common symptom regardless of severity. Those afflicted with Wegener's may have the ailment due to a genetic association, although it can also develop due to bacterial or viral infections.

17.  Treatment and management of Granulomatosis can be broken down into severe (requiring immediate intervention, usually surgical) and maintenance—treatment measures for which would include nasal irrigation, nasal corticosteroids, and antibiotics if infection occurs. Duration of maintenance therapy is usually 12-36 months after remission has been induced. In patients who are at high risk of relapse, maintenance therapy is continued indefinitely. Daniel was considered high-risk due to his other disabilities, especially his diagnoses of Asthma and Type II Diabetes.[2]

---

[1] National Library of Medicine, *Granulomatosis with Polyangiitis,* (Dec. 7, 2021) https://www.ncbi.nlm.nih.gov/books/NBK557827/ (last visited June 3, 2022).
[2] National Library of Medicine, *Granulomatosis with Polyangiitis,* (Dec. 7, 2021) https://www.ncbi.nlm.nih.gov/books/NBK557827/ (last visited June 3, 2022).

18. In 2010, Daniel underwent a surgical procedure to widen his airway, conducted by Dr. Jeremy Sebastian. There were complications, and he was in a coma for three days. In 2012 Daniel went to Dr. Blake Simpson of UT Health San Antonio to reconstruct his entire airway. Dr. Simpson decided on a less invasive measure: scraping Daniel's esophagus to rid him of the fungus that had formed there and to widen his airway. Afterwards, Daniel managed his condition with regular saline rinses to keep his airways clear in addition to annual esophageal scrapings done by Dr. Simpson.

19. When Daniel was arrested in 2019, he'd been maintaining his condition for *years*. He was intimately familiar with what he needed to stay alive, and his medical history was known by Bastrop County Jail (who had a letter written by Miriam Nnabulhe, FNP detailing his numerous disabilities.) (***See* Exhibit A, pg. 97**).

## DETAINMENT & MEDICAL TREATMENT

20. Daniel was detained and in-processed by Bastrop County Jail for credit card abuse on July 31, 2019. The next day, Daniel had his medical intake. Medical Officer Sheri Amman noted "[i]nmate states that he needs to do a saline rinse daily for sinuses. ROI [Release of Information] signed and faxed to walgreens and bluebonnet trails, states that's where he gets his medications." His regular physicians are listed as Dr. Edith of Bluebonnet Trails for "asthma and

disability" as well as Dr. Simpson for Wegener's Disease. (*See* **Exhibit A, pg. 85**).

21.   Despite the fact that Bastrop County Jail and its employees had actual, written knowledge of Daniel's medical disabilities, they failed to administer simple medical treatments that would have saved his life.

22.   Witnessing that the jail was not providing medical treatment to her husband, Diana Zuniga went to the jail herself to try to bring saline rinses (which are not controlled substances) in order to keep Daniel's airways clear and allow him to breath. Nevertheless, a jail doctor, Dr. Wi-Ann Lin, Charted, "Physician does not appreciate inmate telling a different story, trying to shift the blame unto the Medical Department for not having his saline." (*See* **Exhibit A, pg. 76**). This was on August 7, 2019, less than a week since Daniel's intake appointment.

23.   The attitudes of the Medical Officers did not improve. They continued to deny Daniel his saline treatment, and on August 12, he frantically wrote "I am not doing to [sic] well without doing my dr recommended nasal saline twice a day… PLEASE DON'T IGNORE THIS ANY LONGER… IT IS VERY IMPORTAT [sic] TO MY DAILY LIFESTYLE AND WELLBEING." (*See* **Exhibit A, pg. 78**). The *next day* he was taken to the medical center because he was unable to breathe. Daniel told the Medical Officers "I've been trying

to tell y'all for two weeks I needed my nasal saline and y'all haven't done anything." (*See* **Exhibit A, pg. 76**).  Nurse Rose Warren states in the medical notes that Daniel "tearfully stating he needs his [nasal saline] that he makes at home and can't understand why they wouldn't let his wife give it to Medical." (*See* **Exhibit A, pg. 76**).

24.    Several options were given to Medical Officers to accommodate Daniel. Plaintiff Diana offered to order the nasal saline directly from the manufacturer and have it shipped directly to the jail—yet she did not receive any assistance. Daniel himself suggested both Plaintiff Diana's mixture be brought in *and* asked Medical Officers to mix the solution themselves—a simple recipe of salt mixed with baking soda and water. There is no reasonable excuse for a jail to refuse salt and baking soda as a life-saving remedy to a respiratory ailment patient.

25.    According to the Bastrop County Sheriff's Office Health Services Plan, as regulated by the Texas Commission on Jail Standards Chapter 273, Section VI on the Control of Medication: there are only provisions for *prescription medication*. Non-controlled substances, such as Daniel's nasal saline wash, are not mentioned at all (*See* **Exhibit B, pg. 2**).

26.    On August 19, 2019, Daniel asked Medical Officers to help him "order nasal saline bottle and pre mixed solution packets kit from Dr Neil online to have it

delivered to the jail by the manufacture." (*See* **Exhibit A, pg. 74**). He continued to *beg* for medically adequate treatment, saying "I've had 5 nasal surgeries due to my nose being broken several times… I have no natural post nasal drip… I have to rinse… please, please, please… its very important to my daily life and wellbeing." (*See* **Exhibit A, pg. 74**).

27.  Plaintiff Diana, in fear of her husband's life, acquired the correct solution for Daniel's treatments and personally brought it to the jail on August 30, 2019. She was turned away by Medical Officer Julia Duran because it was 'not pre-approved' by Dr. Lin (*See* **Exhibit A, pg. 66**).

28.  The next day, Daniel told Ms. Duran "I don't appreciate how you treated my wife yesterday when she tried to deliver my new squeeze bottle for my premixed packets of nasal wash saline," (*See* **Exhibit A, pg. 65**) to which she cited the medication not being approved. Duran's heartless reply was: "I'm not here to argue with you, this is for inmates who need medical. If you just want to complain you can put in a grievance." (*See* **Exhibit A, pg. 64**).

29.  On September 5, Daniel begs *again* for treatment: "Im not going to be difficult but I still need my saline packets and bottle please… I cant instill to yall how important this is to me… plz help." (*See* **Exhibit A, pg. 62**). The Medical Officer replied that his saline packets and bottle have to be mail ordered and cannot be dropped off by family members. Both Daniel *and* Plaintiff Diana

asked multiple times for assistance in ordering the medication directly from the manufacturer. No one was willing to help them.

30.    On September 9, Daniel was *finally* allowed his nasal treatment, but under the condition that he would only be allowed his medical treatment if he was put into isolation, unable to speak to his wife or kids. Diana recalls that Daniel was *petrified* that, if he was in isolation, he would have an episode while alone and be unable to call for help. Daniel was afraid he would die.

31.    On May 9, 2020, Daniel purchased an ineffective nasal spray from commissary, desperately looking for for any form of relief because he could not breathe. Again, in order to use the necessary medical treatment, he was put into lockdown and isolation. Again, he was afraid for his life. He called his wife in tears, terrified of what might happen if he stopped treatment, but *more* afraid of dying while in isolation. Plaintiff Diana called the jail on May 22 to intercede on Daniel's behalf. She pleaded with them to be allowed to bring him his regular nasal saline. Dr. Lin wrote that Daniel "needs to request saline rinse by writing medical request via Kiosk, and he will need to stay in lockdown due to all the equipment used for saline rinse." (***See* Exhibit A, pg. 24**). Daniel's legitimate fear of dying alone was not addressed. There was not even an *attempt* to compromise for the sake of his medically prescribed treatment.

32.  This is when perceived retaliation against Daniel for his medical treatments began. On May 28, 2020, Daniel was passed over for a 'trusty' position (the 'trusty system' was a penitentiary system of discipline and security in which designated inmates were given various privileges, abilities, and responsibilities not available to all inmates.) (*See* **Exhibit A, pg. 21**).  Medical Officer Olivia Harpos said that Daniel was "not cleared for trusty work due to, too many medical complaints." (*See* **Exhibit A, pg. 22**). This was repeated by Medical Officer Rosa Warren on June 3, 2020 (*See* **Exhibit A, pg. 16**).

## **DEATH**

33.  At approximately 10:30 A.M. on June 10, 2020, a call of distress came from Daniel's block, MO-10. Daniel couldn't breathe. Trying desperately for any help, he took a shower hoping that would clear his airways. Another inmate, Frank Raasch, saw that Daniel was in a dire medical emergency and helped him get dressed, then began banging on the window desperately trying to get the attention of jailers.

34.  Correctional officers arrived at around 10:36 A.M. to take Daniel to the infirmary for treatment. He was described as "awake and responsive, but was not answering questions." He was given a breathing treatment for his asthma, and Medical Officer Julia Duran "stated she heard [Daniel] from her office having trouble breathing and when she looked toward him, she saw he was

pale and sweating." Supervising Medical Officer Mark White instructed Duran to put an oxygen mask on Daniel. White had already told the correctional officers that Zuniga needed to go to the hospital, but White was trying to stabilize Daniel prior to being transported. Daniel was in the Medical Office for approximately 15 to 20 absolutely crucial minutes prior to his transport to the ER.

35.    To make matters worse, Dr. Wei-Ann Lin reported they decided to transport Zuniga in a jail transport vehicle rather than wait on EMS. In jail records, supervisor White confirmed his staff took Daniel to the hospital in a jail car because they did not want to wait (acknowledging too late that time was of the essence). But once they put Daniel into a jail car for transport, jail staff took Daniel to Ascension Seton Bastrop Hospital—10 minutes away—and *not* Seton Health Plaza, which was only 5 minutes away. Jail staff waited too long before rendering aid to Daniel, and once they realized their mistake in waiting too long, they could have and should have taken him to the closest medical facility.

36.    Bastrop County Sheriff's Office Deputy Robert Clipper was chosen for the transport, and Clipper was told that Daniel was stable and ready for transport. At approximately 10:55 A.M. Clipper pulled into the transportation dock before going to the Medical Office where Daniel was being held. Daniel had

to be physically loaded into the transport vehicle by Correctional Officer Claud Johnson. Johnson was tasked with riding in the back of the jail car to keep an oxygen mask on Daniel. On the way to the hospital Daniel began to cough up blood—a sign that a prior doctor told Diana meant that Daniel only had moments to live.

37.    Daniel could not breathe at 10:30 A.M. but it was not until a full hour later at 11:30 A.M. when Daniel arrived at Ascension Seton Bastrop Hospital. He presented with vomited blood covering his body and he was not breathing. He was still handcuffed in the back of the car. Jail staff told the hospital's doctor's that Daniel had a history of "diabetes, drug abuse and throat cancer." There was no mention of his Asthma *or* Granulomatosis—the two disabilities that shrunk his breathing canal.

38.    Doctors described Daniel's condition upon arrival, saying he was "ashen" and in respiratory distress.  Daniel became briefly lucid enough to communicate with the emergency doctors. He pointed to his throat, trying to communicate that it felt like something was stuck there. Communication was labored, and Daniel was covered in his own blood, barely able to speak. Daniel showed the medical team a clump of hard mucus he had coughed up, which Dr. Amar Vira said "looked like a large chunk of meat."

39.    Dr. Vira immediately saw the severity of the situation. It was clear to him that

Daniel had an unstable airway and needed to be intubated for safe transportation to an ICU. He first attempted a controlled RSI—a method of gentle intubation that is used primarily in pediatrics. However, Daniel's airway was already so inflamed and swollen that it was the size of a child's. Dr. Vira used a muscle relaxer to open up Daniel's airway before trying a 7.5 tube, but it was too large. He downsized and tried again, but Daniel started to wake up in distress. Dr. Vira attempted *another* intubation with a size 6 tube, which also failed.

40.    After three unsuccessful attempts to intubate, they pivoted to a Laryngeal mask airway (LMA), a supraglottic airway device. It is a temporary method to maintain an open airway during the administration of anesthesia or as an immediate life-saving measure in a patient with a difficult or failed airway.[3] Their options were dwindling rapidly and Daniel went into cardiac failure.

41.    CPR began, and hospital staff gave Daniel *eight rounds* of epinephrine and a round of atropine. They performed CPR for 26 minutes, and attempted to surgically create an airway via a tracheostomy. They cut into Daniel's neck and attempted another intubation. It was simply too late when Daniel arrived, and hospital staff could do nothing to save Daniel's life.

---

[3] National Library of Medicine, *Laryngeal Mask Airway*, (Feb. 4, 2022) https://www.ncbi.nlm.nih.gov/books/NBK482184/#:~:text=Laryngeal%20mask%20airways%20(LMA)%20are,a%20difficult%20or%20failed%20airway. (Last accessed June 3, 2022).

42.   Doctors called time of death at 8:39 P.M. A deputy was in the room the entire time and he notified the Justice of the Peace. The cause of death, as listed in the autopsy report, was Subglottic and Posterior Glottic Stenosis Associated with Laryngopharyngeal Reflux Disease. The coroner noted that the "presentation of shortness of breath was consistent with his history and with previous episodes he experienced, some of which required intubation."

43.   Daniel Zuniga was incarcerated at Bastrop County Jail for a total 125 days from July 31, 2019, until his untimely death on June 10, 2020. The medical records from his stay show that Medical Personnel *knew* of his disabilities, that the care Daniel received fell desperately short of what his doctors prescribed to him, that they *punished* Daniel for his many visits to the infirmary and that, ultimately, on the day he died they did not supply the hospital with his medical history, they did not allow him to be taken by EMS, they did not take him to the closest medical facility—they *failed* Daniel, over and over again.

## V.     CAUSES OF ACTION

### 42 U.S.C. §1983 CLAIM AS TO BASTROP COUNTY AND BASTROP COUNTY SHERIFF'S OFFICE

44.   Plaintiff incorporates by reference all of the foregoing and further allege as follows:

45.    The acts and failures of Defendants on the occasion in question were unreasonable and were the proximate and producing cause of the injuries and damages suffered by the Plaintiffs. The County of Bastrop and the Bastrop County Sheriff's Office is liable to Plaintiffs under 42 U.S.C. §1983 for acting with deliberate indifference, in failing to provide to the Medical Officers of their jail supervision and training regarding the appropriate treatment of an inmate with serious and well documented disabilities.

46.    42 U.S.C. §1983 holds that: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress…". Daniel Zuniga's Eight and Fourteenth Amendment rights were violated by the misconduct of the officers of Bastrop County Jail, officers who should have been held to a higher standard by the Bastrop County Sheriff's office and Bastrop County.

47.    The County promulgates a manual for Bastrop County Sheriff officers. The Correctional Officers and Medical Officers are expected to know the policies and abide by the policies. Failure to comply with the policies should be noted

by the Bastrop County Sheriff's Office and supervisors, and officers should be disciplined accordingly.

48.    According to the Bastrop County Sheriff's Office Health Services Plan, as regulated by the Texas Commission on Jail Standards Chapter 273, Section II:

> "Emergency medical care is available 24 hours a day. If an emergency beyond the capabilities of the medical staff or facilities of the jail arises, **the inmate will be transported immediately to the nearest facility that has the capabilities to handle the emergency.**" (Emphasis added). (***See* Exhibit B, pg. 1**).

Daniel arrived at the infirmary at approximately 10:36 A.M., six minutes after his initial distress call. It wasn't until nearly 11:00 A.M. that he was transported from the jail to Ascension Seton Bastrop Hospital, which was *not* the closest facility capable of emergency care. In an emergency such as Daniel's, even seconds matter when it comes to medical care.

49.    Section IV of the same document states:

> "Inmates with disabilities will be evaluated by the medical staff to **ensure adequate care and accommodations are provided."** (Emphasis added). (***See* Exhibit B, pg. 1**).

Section VIII states:

> "All examinations, treatment, and other procedures are to be performed in a **reasonable and dignified manner and place**." (Emphasis added). (***See* Exhibit B, pg. 2**).

Daniel had several well documented disabilities that required specialized care. Despite these disabilities being noted in his inmate medical records *and* a letter from a physician detailing his disabilities being available to staff, Daniel was not allowed to complete his prescribed nasal saline rinses in a timely and safe fashion. Instead, Medical Officers continued to insist that he undergo treatment in **lockdown and isolation,** a situation that could prove fatal had Daniel experienced a medical crisis while unable to call for help. The complete and total lack of willingness to accommodate his disabilities is a flagrant disregard to his civil rights and a direct violation of U.S.C. §1983.

### *MONELL* DOCTRINE CLAIM AGAINST
### BASTROP COUNTY AND BASTROP COUNTY JAIL

50.   Plaintiff incorporates by reference all of the foregoing and further allege as follows:

51.   In *Monell v. Dept of Soc. Servs.*, 436 U.S. 693, 701 (1978) the Court held that municipal corporations may be named in a USC 1983 lawsuit. Plaintiffs here will point to the officially adopted or promulgated policies of treatment as outlined in the Bastrop County Sheriff's Office Health Services Plan, as regulated by the Texas Commission on Jail Standards Chapter 273, as well as the Medical Treatment Protocol of Bastrop County Jail and their effect on the named medical officer's training failures.

52.   Plaintiffs have cited above sections IV, and VIII of the Bastrop County

Sheriff's Office Health Services Plan, showing that the regulations *as written* do not provide sufficient guidance in the treatment of inmates with documented medical disabilities. Plaintiffs would further cite the Medical Treatment Protocol of Bastrop County Jail; there are *two pages*—less than 700 total words—dedicated to treatment of respiratory ailments. This document instructs medical officers on the treatment in cases of shortness of breath, asthma, tuberculosis, allergies and the common cold, amongst other things (*See* **Exhibit B, pgs. 26-27**).

53.   The number of individuals effected by tuberculosis in 2020 was 2.2 per 100,000 persons[4], yet the Bastrop County Jail Medical Treatment Protocol saw fit to dedicate over a quarter of its instruction on the treatment of respiratory illnesses to it. It is beyond clear that the policies and procedures in place for the medical care of inmates like Daniel are woefully inadequate. The medical officers treating Daniel may have been following protocol as closely as possible, but the protocol itself was deficient.

54.   In *City of Canton v. Harris,* the question before the Supreme Court was whether or not the city could be held liable under USC 1983 if the policy in question was not, on its face, unconstitutional (*City of Canton*, 489 U.S. at

---

[4] Deutsch-Feldman M, Pratt RH, Price SF, Tsang CA, Self JL, *Tuberculosis — United States, 2020*, Centers for Disease Control and Prevention (March 26, 2021), http://dx.doi.org/10.15585/mmwr.mm7012a1 (Last visited June 8, 2022).

383). The Court held that the city *could* be held liable under 1983 regardless of the constitutionality of the policy in question (*Id*. at 387). A governing entity—such as a city or county—may be held liable for constitutional violations committed by a non-policymaking employee if the policy in question is objectively deliberately indifferent to the likelihood of a constitutional violation occurring (*Id*. at 388).

55.   The Court indicated two ways in which Plaintiffs may show the requisite objective deliberate indifference—if there was an obvious need to train, or if a pattern of constitutional violations become apparent, the court will hold the city on constructive notice; and if no training, supervision or discipline is put in place the city would be held liable (*Id*. at 390). Here, Plaintiffs allege that there was an obvious and deadly lack of training.

56.   The Bastrop County Sheriff's Office Health Services Plan, as regulated by the Texas Commission on Jail Standards and the Medical Treatment Protocol of Bastrop County Jail do not provide sufficient training on the handling and care of severely medically disabled inmates. The treating medical officer's inaction and indifference constitutes a violation of the *Monell* Doctrine as they were following protocol as written, despite said protocol being inadequate. Their inaction and indifference was the direct and proximate cause of Daniel's death.

## AMERICANS WITH DISABILITIES ACT
## CLAIM AGAINST BASTROP COUNTY

57.    Plaintiff incorporates by reference all of the foregoing and further allege as
follows:

58.    Daniel Zuniga was a qualified individual with several disabilities, namely:
Type 2 Diabetes, Gastroesophageal Reflux Disease (GERD), Wegner's
Granulomatosis (now known as Granulomatosis with polyangiitis),
Pancreatitis and Asthma. These disabilities impaired his ability to function
normally if left untreated.

59.    Bastrop County receives federal funds and has an obligation to accommodate
individuals with disabilities that enter its jail.

60.    Here, Bastrop County knew that Daniel suffered from several disabilities that
impacted the efficacy of his airway and required regular nasal saline rinses. In
fact, Daniel *begged* Medical Officers on several occasions to allow him his
life-saving medical treatment. On August 12, 2019, Daniel said: "**I am not
doing to well without doing my dr recommended nasal saline twice a
day**…." On August 13, 2019, he said: "**Nasal saline please… I cant
breath…**". On September 5, 2019, he said: "**Im not going to be difficult but
I still need my saline packets and bottle please… I cant instill to yall how
important this is to me… plz help.**" The day Daniel died, June 10, 2020,
when the Medical Officer treating him observed his respiratory emergency,

Daniel replied: "**that's why I've been telling y'all I need my saline**."

61.    The county and its employees knew or should have known that Daniel's disabilities were documented, verified, life threatening and required specialized care to manage.

62.    Despite this, Bastrop County disregarded Daniel's multiple conditions and failed to accommodate his disabilities. More particularly, they failed to provide him his physician mandated nasal saline washes in an environment that would not prove hazardous to his health.

63.    As a direct and proximate result of the above, Daniel Zuniga was denied a service or benefit to which he was entitled on the basis of his disabilities. Without appropriate accommodations, his conditions grew worse, leading ultimately to his death at only 38 years old.

## EIGHTH AND FOURTEENTH AMENDMENTS VIOLATION CLAIM AGAINST BASTROP COUNTY SHERIFF'S OFFICE

64.    Plaintiff incorporates by reference all of the foregoing and further allege as follows:

65.    Almost 50 years ago, the Supreme Court held that "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying

access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble*, 429 U.S. 97, 104-05, 97 S.Ct. 285, 291, 50 L.Ed.2d 251, 260 (1976) (emphasis added) (internal quotation marks and citations omitted).

66.   Here, Plaintiffs allege that Defendant's refusal to accommodate Daniel's repeated requests for nasal saline washes, despite such a treatment being common maintenance for the disability that he was well documented as having, constitutes a violation of his Eighth Amendment protection against cruel and unusual punishment, as well as his Fourteenth Amendment protection against the deprivation of equal protection under the laws of this nation.

67.   As a direct and proximate result of the above, Daniel was not given the life-saving medical attention he needed. Had Daniel been allowed to use his medically necessary saline washes twice a day, in view of a Corrections Officer or Medical Officer, he would still be alive. The complete and utter lack of care shown towards a man that begged for even a baseline of care is astonishing an abhorrent. When Daniel *was* allowed saline rinses, he was made to do so in total isolation, away from anyone that would be able to assist should he experience a medical emergency. These flagrant violations of Daniel's constitutional rights are unequivocally the direct and proximate

cause of his death.

## VI.   DAMAGES

68. As the actions and omissions of Defendants, their agents, employees, and/or representatives, proximately caused and/or were the moving force of the injuries and damages to Plaintiffs and were the moving force of the wrongful death of Daniel Zuniga Jr., Deceased, Plaintiffs assert claims under the 42 U.S.C. § 1983 and the wrongful death and survivorship statutes as specifically pled herein.

69. More particularly, Plaintiffs, in their capacity as heirs at law, assert a survival claim on behalf of the estate of Daniel Zuniga Jr., which has incurred damages including, but not limited to, the following:

- Conscious pain and suffering;

- Past and future mental anguish;

- loss of consortium;

- funeral and/or burial expenses;

- attorneys' fees and costs pursuant to 42 U.S.C. §1988, or as allowed by law.

## VII.   ATTORNEY'S FEES AND COSTS

70. Pursuant to 42 U.S.C. § 1988, Plaintiffs are entitled to recover attorneys' fees and costs including litigation costs and expert fees, and so claim.

## VIII.     JURY DEMAND

71.     Plaintiffs respectfully demand a trial by jury.

## PRAYER

WHEREFORE, Plaintiffs pray that Defendants be cited according to law to appear and answer herein, and that upon final trial, Plaintiffs have judgment against Defendants as follows:

1.     Award compensatory damages against Defendants;

2.     Find that Plaintiffs are the prevailing parties in this case and award them attorneys' fees, court costs, and litigation expenses including but not limited to expert fees under 42 U.S.C. §1988 and/or Tex. R. Civ. P. 131;

3.     Award pre-judgment and post-judgment interest at the highest rate allowable under the law; and

4.     And other relief the Court determines is just under the circumstances.

Respectfully submitted,

By:_____

L. JAMES WOOD
Texas Bar No. 24076785
james@lineofdutylaw.com


**THE JAMES WOOD LAW FIRM, PLLC**
500 W. 2nd Street, Suite 1900
Austin, Texas 78701
P:       512.692.9266
F:       512.686.3152
W:       jwoodlegal.com
CC:       natalie@lineofdutylaw.com

E-File Service Address:
eservice@lineofdutylaw.com
**ATTORNEY FOR**
**PLAINTIFFS**